FILED IN OPEN COURT

ON __6|17|26BRH__

Peter A. ___ Jr., Clerk
US Dis ___
Easte___ ___ NC



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:26-CR-104

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **INDICTMENT** |
| | ) | |
| JAMES THOMAS FOLEY | ) | |

The Grand Jury charges that at all relevant times:

## The Medicare Program

1. The Medicare Program (Medicare) was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services.

2. Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b) and a "federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was assigned a unique Medicare identification number.

4. As part of the Medicare enrollment process, health care providers ("providers") who provided items or services to beneficiaries submitted enrollment applications to Medicare. The Medicare provider enrollment application, CMS Form

1

855S, required a provider, or an authorized representative of the provider, to certify that the provider would comply with all Medicare-related laws, rules, and regulations, including that the provider "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." The provider's certification also bound the provider to comply with the federal Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b.

5. If Medicare approved a provider's application, Medicare assigned the provider a Medicare provider number. A provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for medically necessary items and services rendered to beneficiaries. Medicare providers were given access to Medicare manuals and service bulletins describing procedures, rules, and regulations.

6. When seeking reimbursement from Medicare, providers submitted the cost of the items and/or services provided together with the appropriate code, as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System.

7. Medicare included coverage under component parts. Medicare Part B covered, among other things, medical items that were reasonable and medically necessary.

8. A beneficiary's out-of-pocket costs included coinsurance and an annual deductible. The Medicare Part B coinsurance was generally 20 percent of the allowed charge for each item or service received. Each year, Medicare deducted the

2

beneficiary's deductible from its first payments to the beneficiary's providers until the full deductible amount has been exhausted. The beneficiary was responsible for paying the providers directly for this amount. In 2019 through 2023, the Medicare Part B annual deductible varied between $185 and $226.

### Other Federal Health Care Benefit Programs

9. TRICARE is the Department of Defense's healthcare benefit program providing coverage for active-duty service members, retirees, and their eligible dependents. CHAMPVA is a Department of Veterans Affairs program that offers healthcare benefits to the spouses and dependents of certain disabled or deceased veterans. Both programs include coverage for items and services with rules and coverage requirements similar to those of Medicare.

### Durable Medical Equipment

10. Durable medical equipment ("DME") was reusable medical equipment such as orthotic devices and pneumatic compression devices ("PCDs"). Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces. PCDs were an inflatable garment with an accompanying electrical pneumatic pump that filled the garment with compressed air. DME was covered by Medicare under Part B. TRICARE and CHAMPVA also paid claims for DME under certain circumstances.

11. Medicare would pay claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of a diagnosed and covered condition, and was actually

3

provided to beneficiaries. PCDs were medically necessary when prescribed to treat lymphedema or chronic veinous insufficiency with venous stasis ulcers. In addition to the required diagnoses, an unsuccessful trial of conservative therapy had to be documented in the beneficiary's medical records before prescribing any type of PCD. If the above requirements were not met, a claim for supplying a PCD was not eligible for reimbursement by Medicare, as the claim would be deemed not reasonable and medically necessary.

12. Medicare prohibited DME suppliers from directly soliciting beneficiaries when supplying Medicare-covered items absent certain circumstances.

### The Defendant and Relevant Entities

13. The Defendant, James Thomas Foley (FOLEY), was a resident of Youngsville, North Carolina. FOLEY was the owner of London Medical Supply, LLC; Harp Medical Supply, LLC; and Advanced Rehab Technologies, LLC; which were based in Wake Forest, North Carolina. These entities were limited liability companies incorporated in North Carolina and operated as DME supply companies. They submitted claims to Medicare, TRICARE, and CHAMPVA for DME supplied to those programs' beneficiaries.

14. R.F.W. was the owner of Greenleaf Medical Supply, LLC (GMS) and Nevaeh & Company, LLC d/b/a Restorative Medical (NC-RCM), which were based in or near Winston-Salem, North Carolina. GMS and NC-RCM operated as DME supply

4

companies, which submitted claims to Medicare, TRICARE, and CHAMPVA for DME supplied to those programs' beneficiaries.

15. Dox Depot, LLC (Dox Depot) and Tri-Cities, LLC (Tri-Cities) were North Carolina limited liability companies owned and operated by J.N., a resident of the Winston-Salem, North Carolina area. Dox Depot and Tri-Cities purported to provide marketing/call center services that generated doctors' orders. Such orders consisted of a completed doctor's (or other care provider's) order, beneficiary demographic information, insurance information, and recordings of marketing phone calls with the beneficiary.

16. QHS, LLC was a North Carolina limited liability company owned and operated by J.N. that provided billing services for companies submitting claims to Medicare and other health care benefit programs.

17. In addition to founding and operating his own companies to bill Medicare for unnecessary DME, R.F.W. helped others do the same, including the Defendant, FOLEY.

18. R.F.W. helped FOLEY to enroll some of his DME businesses with Medicare and helped FOLEY replicate the same business model utilized by R.F.W.

19. M.R. was the owner of Magnolia Healthcare, LLC d/b/a Therapeutic Healthcare (Magnolia) and Bluewater Healthcare, LLC (Bluewater). Magnolia and Bluewater were limited liability companies incorporated in Louisiana, which operated as DME supply companies. Magnolia and Bluewater also submitted claims to Medicare, TRICARE, and CHAMPVA for DME supplied to those programs'

5

beneficiaries. R.F.W. helped M.R. to enroll these businesses with Medicare and helped M.R. replicate the same business model utilized by R.F.W. and FOLEY.

### The Scheme and Artifice to Defraud

20. It was a purpose of the conspiracy for FOLEY, R.F.W., J.N., and M.R. to unlawfully enrich themselves by: (a) shipping and delivering medically unnecessary DME to Medicare beneficiaries; (b) routinely waiving required copayments and deductibles on DME shipped to Medicare beneficiaries and reimbursed by Medicare; (c) submitting and causing the submission of false and fraudulent claims to Medicare, including for items purportedly rendered to beneficiaries located in the Eastern District of North Carolina and elsewhere; (d) receiving and obtaining the reimbursements paid by Medicare based on the false and fraudulent claims submitted; (e) concealing the submission of false and fraudulent claims to Medicare; and (f) diverting proceeds of the fraud for the personal use and the benefit of the Defendant and his co-conspirators. FOLEY, R.F.W., M.R., and J.N. also conspired to similarly defraud TRICARE, CHAMPVA, and other healthcare benefit programs.

21. The manner and means by which FOLEY and his co-conspirators sought to accomplish the objects and purpose of the conspiracy, included, among other things:

    a. The fraudulent orders for DME, including but not limited to PCDs, were based on information primarily derived from telemarketing solicitations of beneficiaries. Dox Depot and Tri-Cities contracted with telemarketing and other companies to purchase the beneficiary information gained through the solicitations and generated doctors' orders for DME, which

6

they sold to the aforementioned DME supply companies associated with FOLEY, R.F.W., and M.R. The representatives from these telemarketing companies, who had no apparent medical training, obtained the beneficiaries' names, unique Medicare identification numbers, and medical history, which Dox Depot and Tri Cities, in turn, used to populate the DME orders.

b. In marketing PCDs the call center representatives would often simply ask beneficiaries if they had pain or swelling in their legs. The call center representatives would not ask questions regarding diagnoses for lymphedema or chronic veinous insufficiency with ulcers nor have any discussion of whether the beneficiaries were unresponsive to other clinical treatment as required by Medicare.

c. The call center representatives would also assure Medicare beneficiaries that the DME would be "at no cost" to them, even though Medicare regulations require the collection of copays and deductibles. In turn, the DME companies owned by FOLEY, R.F.W., and M.R. declined to collect copays and deductibles, knowing that beneficiaries would be more likely to decline the DME if they incurred out-of-pocket costs. The promises not to collect copays and deductibles, and their non-collection, for the purpose of inducing beneficiaries to agree to receive DME violated Medicare rules codified at Title 42, United States Code, Section 1320a-7b(b).

d. FOLEY, R.F.W., and M.R. nevertheless purchased the pre-populated doctors' orders for DME from Dox Depot and Tri-Cities, which formed the basis of the fraudulent billing.

e. Further, FOLEY, R.F.W., and M.R. developed and implemented a "doctor chase" model in order to deceive and pressure physicians into signing the DME orders and supporting documentation. To effectuate the "doctor chase," third-party contractors working on behalf of J.N., and employees of the aforementioned DME supply companies who reported to FOLEY, R.F.W., and M.R., persistently and aggressively faxed the DME orders and purported "certificates of medical necessity," to a beneficiary's medical provider until they completed the forms. The forms often contained false and misleading language, including that the beneficiary had "requested" the PCDs in order to "help them overcome the discomfort they experience during their day-to-day activities," in order to make the forms appear legitimate, even though the statements were often untrue.

f. Upon receipt of the signed DME orders and false certificates of medical necessity from the beneficiaries' medical providers, FOLEY and his co-conspirators directed QHS to submit false and fraudulent claims to Medicare for the medically unnecessary DME on behalf of London Medical Supply, LLC; Harp Medical Supply, LLC; and Advanced Rehab Technologies, LLC.

22. In total, the DME supply companies owned by or affiliated with FOLEY

received over $14.5 million in reimbursement from Medicare for DME ordered through the aforementioned scheme.

## COUNT ONE

23.     The allegations contained in the preceding paragraphs of this Indictment are incorporated by reference into Count One and are realleged as factual allegations.

24.     It is further alleged that JAMES THOMAS FOLEY, J.N., R.F.W., M.R., and others known and unknown to the Grand Jury, carried out the conspiracy in the manner and means as set forth in those paragraphs.

25.     Beginning at a time unknown, but no later than January 2019, and continuing through around December 2023, both dates being approximate and inclusive, in the Eastern District of North Carolina and elsewhere, the Defendant, JAMES THOMAS FOLEY, and others known and unknown to the Grand Jury, did combine, conspire, confederate, agree, and have a tacit understanding with each other to commit offenses against the United States, that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), namely, Medicare and other health insurers, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owed by, and under the custody and control of, Medicare and such other insurers, in connection with the delivery of, and payment for, health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

9

26. The allegations contained in the preceding paragraphs of this Indictment are incorporated by reference into Counts Two through Seven and are realleged as factual allegations.

27. The Defendant, FOLEY, was aware that Medicare generally only paid 80 percent of allowable charges for DME, and that the remaining 20 percent was considered the obligation of the beneficiary, whether through secondary insurance or out-of-pocket expense. The beneficiaries that are the subject of Counts Two through Seven were obligated to pay—in addition to any remaining deductible—the full 20 percent of the allowable charges because no secondary insurer was billed.

28. Rather than fully advising patients of the nature and extent of their out-of-pocket obligations, contractors and FOLEY's employees actively deceived beneficiaries regarding their responsibilities. Telemarketing contractors assured Medicare beneficiaries that the DME would be "at no cost" to them, even though Medicare regulations require the collection of copays and deductibles. Employees of London Medical Supply, LLC; Harp Medical Supply, LLC; and Advanced Rehab Technologies, LLC; acting at FOLEY's direction, falsely advised beneficiaries that they owed no out-of-pocket balance. The purpose of this deception was to induce beneficiaries to accept DME that was billed to Medicare, with the false understanding that they owed no copayment or deductible.

29. FOLEY did not inform Medicare that he was engaging in the foregoing practices. Instead, he continued to bill Medicare as though such sums were being

charged and collected.

30. The foregoing practices did not occur as the result of an individualized assessment of each patient's financial need or ability to pay, but rather, as a standard business practice for Medicare beneficiaries who lacked secondary insurance.

31. R.F.W. and M.R. engaged in the same or similar conduct on behalf of their own DME companies, in coordination with J.N.

32. In total, between January 2019 and December 2023, FOLEY caused more than hundreds of thousands of dollars in Medicare patient obligations to go uncharged, written off, and uncollected. Despite this fact, FOLEY reaped the full financial benefit of all such DME billed to Medicare for these same patients.

33. For each count listed in the following table, between the approximate dates listed for each count, in the Eastern District of North Carolina and elsewhere, the Defendant, JAMES THOMAS FOLEY, aiding and abetting others, did knowingly and willfully pay, and cause to be paid remuneration, to wit, the value of uncollected patient coinsurance and deductible obligations, directly and indirectly, in cash and in kind, to the person listed in each row of the table below, to induce said person to purchase DME, a good and item, and service for which payment may be made in whole or in part under Medicare, a Federal Health Care Benefit Program:

| Count | Date Range | Beneficiary | Charges | Allowed Charges | Remuneration | Amount Beneficiary Paid |
|---|---|---|---|---|---|---|
| 2 | 2/3/2022 – 2/4/2022 | B.A. | $2,935.60 | $2,189.49 | $437.89 | $0 |
| 3 | 5/30/2023 – | R.Bi. | $591.78 | $411.26 | $82.25 | $0 |

11

| | | | | | | |
|---|---|---|---|---|---|---|
| | 11/30/2023 | | | | | |
| 4 | 6/2/2022 | R.Bo. | $3,062.81 | $2,215.72 | $443.14 | $0 |
| 5 | 3/29/2022 – 4/12/2022 | M.S. | $3,657.37 | $3,041.10 | $794.62 | $0 |
| 6 | 6/16/2022 – 7/6/2022 | C.W. | $3,901.88 | $2,712.61 | $542.51 | $0 |
| 7 | 2/16/2022 – 3/3/2022 | J.W. | $6,613.51 | $5,077.39 | $1,050.33 | $0 |

Each row of the foregoing table constituting a separate violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Title 18, United States Code, Section 2.

Case 5:26-cr-00104-FL-KS     Document 1     Filed 06/17/26     Page 12 of 14

## Notice of Forfeiture

Notice is hereby given that all right, title and interest in the property described herein is subject to forfeiture.

Upon conviction of any Federal health care offense as defined in 18 U.S.C. § 24(a), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the said offense.

The forfeitable property includes, but is not limited to, the following:

Forfeiture Money Judgment:

a) A sum of money representing the gross proceeds of the offense(s) charged herein against JAMES THOMAS FOLEY, in the amount of at least $14,532,930.

If any of the above-described forfeitable property, as a result of any act or omission of a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

Case 5:26-cr-00104-FL-KS    Document 1    Filed 06/17/26    Page 13 of 14

to seek forfeiture of any other property of said defendant up to the value of the

forfeitable property described above.

A TRUE BILL:

REDACTED VERSION
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

FOREPERSON

Date: 6/16/26

W. ELLIS BOYLE
United States Attorney

BY _____

DAVID G. BERAKA
Assistant Unites States Attorney

14